**In re Zandal HOSKINS, and Debra Allyne Hoskins, Debtors.**

**Bankruptcy No. 94–91598–BHL–13.**

United States Bankruptcy Court,
S.D. Indiana,
New Albany Division.

June 16, 1995.

Lloyd Koehler, New Albany, IN, for debtors.

Joseph M. Black, Jr., Trustee, Seymour, IN.

## MEMORANDUM

BASIL H. LORCH, III, Bankruptcy Judge.

This matter came before the Court on May 9, 1995, for hearing on NBD Bank, NA's ["NBD"] objection to the confirmation of debtors' Chapter 13 plan. NBD's objection involves the valuation of collateral to be retained by the debtors under the terms of their plan. NBD asserts that the proper valuation of its security, a 1990 Ford Tempo, is the retail value. The Trustee and the debtors contend that the proper valuation is something less than retail value.

### Statement of Facts

On November 7, 1994, Zandal and Debra Hoskins ["Debtors"] filed a petition for relief under Chapter 13 of the Bankruptcy Code. The debtors' Chapter 13 plan was subsequently filed on January 13, 1995, which valued NBD's secured claim on a 1990 Ford Tempo at $3,987.50. The valuation represents a figure midway between the stipulated retail value of $4,650.00 and the wholesale value of $3,325.00. The plan proposed to pay general unsecured creditors approximately five percent of their allowed claims.

NBD objected to the valuation of the vehicle and filed a secured proof of claim in the amount of $4,874.50, plus interest and attorney fees.

### Discussion

The "Adjustment of Debts" of an individual provided for under Chapter 13 of the Bankruptcy Code includes the ability of a debtor to alter the rights of a secured creditor. NBD recognizes that its contractual rights may be "adjusted" but asserts that the valuation of its collateral proposed by the debtors goes too far. That proposal would pay over the life of the plan a "value" midway between the wholesale and retail value of the vehicle. This case, then, presents the narrow question of the proper value of a 1990 Ford Tempo and the broader issue of the correct method of valuing vehicles in Chapter 13s.

Vehicles are crucial components of most Chapter 13 plans. An "individual with regular income" is eligible to file a Chapter 13. 11 U.S.C. Section 109(e). In order to generate such income in the 1990s, especially in an area devoid of public transportation, cars are a necessity. The threat of a loss of a vehicle or the inability to catch up car payments has compelled the filing of many Chapter 13 petitions. In some instances, the debtor's desire to keep a car and the inability to reaffirm the original obligation are primary factors in choosing Chapter 13 instead of Chapter 7. Once the petition is filed, the unsecured creditors usually share the debtor's desire to keep the car and hence the job. For Chapter 13 plans to succeed, debtors must have the ability to do just that.

The valuation decision, because of the importance of the vehicle, is often pivotal in Chapter 13s and its impact is not limited to the two parties at bar. The amount the debtor is required to pay for a vehicle affects the feasibility of the plan, the percentage of the distribution to the unsecured creditors as well as the debtor's decision to retain or surrender collateral held by other secured creditors. To guide the Court in this crucial determination, the parties begin at two common points, sections 506 and 1325 of the Code. From there they follow conflicting authority to arrive at opposing conclusions.

Section 1325 sets forth the requirements for confirmation of a plan under Chapter 13 of the Bankruptcy Code. With respect to a secured creditor, it gives the debtor three options. The debtor can reach an agreement with the creditor, he can surrender the collateral, or, as in this case, provide for the retention of the lien and payment to the creditor of an amount equal to its allowed secured claim. 11 U.S.C. Section 1325(a)(5). The amount of this allowed secured claim, which is the crux of the dispute in this case, is then to be determined by reference to Section 506(a) of the Code.

Several courts have been confronted with this question and have reached different conclusions as to the proper method of valuation under § 506(a) when a debtor proposes to retain the secured collateral. The interpretation of § 506(a) is complicated by the interplay between the first and last sentences of the subsection. Courts have reached divergent results depending upon which sentence they place their emphasis.

Guided by the precept that a statute shall be interpreted according to its plain meaning, *Patterson v. Shumate*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992); *Matter of Voelker*, 42 F.3d 1050, 1051 (7th Cir.1994), the Court thus turns to Section 506(a), which provides as follows:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

The first sentence of 506(a) provides that the creditor has a secured claim to the extent of the value of the *creditor's interest in the estate's interest* in the property. In order to give effect to the plain meaning of said language, the Court must ascertain the value of the estate's interest, as well as the value of the creditor's interest. Considering this sentence only, the statute appears to limit the value of the creditor's secured claim to the interest held by the estate in that property.

The statute goes on, however, to provide that the value is to be determined in light of the *purpose of the valuation and of the proposed disposition or use of such property*, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest. Legislative history indicates that such provision requires valuation to be made on an ad hoc, or case by case, basis and determined in light of the proposed use of the collateral. *See*, H.R.Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6312; *and see*, S.Rep. No. 989, 95th Cong., 1st Sess. 68, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5854. The majority of the circuits which have recently considered the interpretation of § 506(a) have focused on this provision, holding that the creditor's lien is to valued in light of the purpose and use of the collateral. *In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72 (1st Cir.1995); *In re Trimble*, 50 F.3d 530 (8th Cir.1995); *In re Rash*, 31 F.3d 325 (5th Cir.1994); *In re Coker*, 973 F.2d 258 (4th Cir.1992). In so holding, each of the foregoing circuits rejected the wholesale valuation endorsed by the Ninth Circuit in *In re Mitchell*, 954 F.2d 557 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 303, 121 L.Ed.2d 226 (1992).

While the emerging trend embraces a retail valuation, a consideration of the statutory language, together with the underlying goals

of the Bankruptcy Code and the applicable caselaw, compel this Court to conclude that a systematic retail valuation is neither mandated by statutory language nor does it further the underlying goals of the Code. The second sentence of § 506(a) ensures that the valuation is made with due regard to the purpose of the valuation and the proposed disposition or use of such property. Because this sentence requires a valuation based upon the particular circumstances of the case, the specific facts supporting the recent Circuit decisions should be reviewed.

In *In re Coker, supra,* the Chapter 13 debtors sought to retain certain real estate encumbered by two deeds of trust. The Cokers filed a motion to avoid the lien of the junior deed of trust. In this context, the Fourth Circuit held that disposition costs of hypothetical sale were not to be deducted from fair market value when determining the extent of the security interest held by the junior lienholder. That court relied upon its previous decision of *In re Balbus,* 933 F.2d 246 (4th Cir.1991), wherein it declined to deduct hypothetical costs of sale where such a deduction would have increased the value of the unsecured claims beyond the $100,000 jurisdictional limit. In that case, the court considered that the purpose of the valuation and the proposed use did not warrant a different result.

The First Circuit reached a similar conclusion in *In re Winthrop Old Farm Nurseries, Inc., supra,* in an action to determine the status of the undersecured junior mortgagee in a Chapter 11 case. In that case, the debtor sought to retain real property for use in its nursery and landscaping business. The court held that the fair market value, without deduction of hypothetical costs of sale, was the proper measure of worth for purposes of determining the secured or unsecured nature of the lienholder's claim. The court, in reaching such outcome, emphasized that:

> In any particular case, *especially a reorganization case, the determination of which entity should be entitled to the difference between the going concern value and the liquidation value must be based on equitable considerations arising from the facts of the case.* (emphasis supplied)

*In re Winthrop,* 50 F.3d at 74.

In the Fifth Circuit case of *In re Rash, supra,* the court held that the replacement cost approach was the appropriate method for valuing an undersecured creditor's allowed secured claim in a Chapter 13 plan. In that case, the debtor retained a commercial truck used in debtor's freight hauling business. The court noted that valuation should be made in light of its purpose and the proposed use in the reorganization. The court then concluded that any valuation below retail would alter the parties substantive rights and result in a windfall to the debtor. *In re Rash,* 31 F.3d at 330.

Finally, the Eighth Circuit cast its vote in favor of a retail valuation in the recent case of *In re Trimble, supra.* In that case, however, the debtor's plan proposed to pay unsecured claims in full and the issue before the court was limited to the amount of interest to be paid. The Eighth Circuit adopted the reasoning of the Fifth Circuit decision of *In re Rash* and held in conformity therewith. In so holding, the Court concluded that a blanket wholesale valuation would ignore the last sentence of the statute mandating consideration of purpose and proposed usage.

This Court considers most of the above cited cases to be factually distinguished from the instant case. For instance, even though *Rash* was a Chapter 13 case, it involved commercial property more commonly associated with Chapter 11s. Certainly, the fact that a debtor plans to use collateral to produce income would be of utmost importance when weighing the proposed use of the property under 506(a).

As one commentator has observed, there are sound reasons for valuing commercial collateral in a "going-concern, replacement-cost, or retail-price-valuation" because "the secured party's collateral usually is accounts, equipment, or a fleet of trucks, and not one car. Accordingly, a secured creditor's non-bankruptcy disposition of such property might normally be to an end user and not to a wholesale intermediary as in the typical consumer car loan case." *See,* Arnold B.

Cohen, *Issues in Consumer Bankruptcy*, 2 J.Bankr.L. & Prac. 761 (1992).

The *Coker* and *Winthrop* decisions both involve real estate as collateral. Real estate generally appreciates in contrast to vehicles which rapidly depreciate. In *Coker*, there was no dispute as to the fair market value of the property to be retained. The only issue was whether the debtor could deduct the disposition costs of a hypothetical sale from the fair market value in determining the secured claim. Such a deduction is not proposed by the debtor in the instant case. As Professor Cohen noted in the above cited Article, "[i]n Chapter 13 cases involving a debtor's car, secured creditors are usually banks or the financing subsidiaries of car manufacturers, such as Ford Motor Credit Corporation, Chrysler Credit Corporation, or GMAC,.... And such companies usually dispose of the cars by selling them at car auctions at wholesale prices." *Id.* at 767. Thus by proposing a value arrived at by averaging wholesale and retail, the debtor herein may well be adding to, not subtracting from, the amount to be recovered from a hypothetical liquidation.

*Winthrop* is a Chapter 11 case which involves commercial real estate and, as a result, is easily distinguished from the instant case. Section 506(a), read in its entirety, should provide courts with the flexibility to deal with differing factual situations. As the First Circuit acknowledged in *Winthrop*, each case hinges upon equitable considerations arising from the facts of the case. No singular method of valuation may be touted as the appropriate standard. Instead, Congress envisioned that Courts would employ a more deliberate and thoughtful approach to the valuation question "in light of the purpose of the valuation and the proposed use or disposition of the collateral." 11 U.S.C. § 506(a).

*In re Trimble, supra*, is the strongest precedent in favor of a blanket rule requiring retail valuation of vehicles which the debtor plans to retain in Chapter 13s. It is in direct conflict with the earlier Ninth Circuit decision of *In re Mitchell*, 954 F.2d 557 (9th Cir.1992), which held that the wholesale value should generally apply in valuing vehicles,

but that replacement cost may be appropriate where the collateral is being used as part of a going concern or where the debtor's use warrants a different valuation. In overruling the district court, the Eighth Circuit in *Trimble* relied upon the "income-stream" logic espoused in *In re Green*, 151 B.R. 501 (Bankr.D.Minn.1993) and adopted by the Fifth Circuit in *In re Rash, supra*. *Trimble*, 50 F.3d at 531–32.

While acknowledging the need to render meaning to the second sentence of 506(a), this Court cannot conclude that such sentence requires an automatic retail rule. The debtor in this case has not presented the Court with a pure wholesale versus retail decision. The proposed valuation, while perhaps viewed as simply "splitting the difference," appears to satisfy the two-prong test of 506(a) and represents the type of pragmatic compromise often utilized by bankruptcy judges in administering large numbers of cases. Several bankruptcy court decisions have adopted an average of the NADA wholesale and retail values. *In re Myers*, 178 B.R. 518 (Bankr.W.D.Okl.1995); *In re Carlan*, 157 B.R. 324 (Bankr.S.D.Tex.1993); *In re Stauffer*, 141 B.R. 612 (Bankr.N.D.Ohio 1992); *In re Thayer*, 98 B.R. 748 (Bankr. W.D.Va.1989).

The "purpose of the valuation" in this case is to value the collateral in order to confirm a Chapter 13 plan. If that phrase is given meaning then a court must make distinctions dependant upon, in part, the reason for the valuation. A valuation for purposes of relief from stay pursuant to § 363, a Chapter 11 confirmation pursuant to § 1129 or an 1111(b) election, or a Chapter 12 confirmation pursuant to § 1225, all present unique considerations. The underlying policies and goals of Chapter 13s as well as the criteria for confirmation form the framework in which the decision in this case is to be reached.

The feasibility of the plan, the good faith of the debtor, and the percentage of distribution to the unsecured creditors are all factors the Court must consider at a Chapter 13 confirmation. A Chapter 13 plan is normally shorter in term than a Chapter 11 plan and the right of a Chapter 11 or 12 debtor to pay

real estate debt over an extended period of time does not exist in Chapter 13. Recognition of these fundamental differences between the chapters, the nature of the collateral, and the requirements of § 1325 will define the "purpose of the valuation" in the confirmation context.

The Supreme Court, in deciding *Nobelman v. American Sav. Bank*, —— U.S. ——, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), referred to the "interplay" between different provisions of the Bankruptcy Code. *Id.* —— U.S. at ——, 113 S.Ct. at 2108. There, the Court held that § 506(a) could not be read without reference to § 1322(b)(2) in the treatment of a home mortgage under a Chapter 13 plan. Here, NBD's rights under § 506 cannot be ascertained without reference to § 1325.

It is axiomatic that a debtor does not have to pay retail value for a vehicle to have a plan confirmed under § 1325. That section clearly gives debtors the option to surrender the vehicle and neither party has suggested that surrender would result in a retail recovery to the creditor. The "interplay" between sections 1325 and 506, then, does not point to the hard and fast retail requirement that NBD would suggest.

Additionally, there are sound policy reasons for encouraging Chapter 13 filings. While Chapter 7s provide the cleanest "fresh start" for financially distressed individuals, Chapter 13s offer debtors a chance to pay a portion of their debts and to retain valuable collateral. In order to take advantage of the Chapter 13 benefits, debtors must submit their disposable income for at least a three year period.[1] Chapter 13 filings have increased dramatically in this district in the last few years [2] and Congress, by increasing the applicable debt limitations, has fostered that trend.[3]

In a Chapter 13 confirmation hearing involving a consumer debtor and a private noncommercial vehicle, a court's consideration of the purpose of the valuation and use of the property must include consideration of the interests of unsecured creditors. To always require retail value would ignore the later consideration. In many cases, this would be tantamount to reaffirming the original obligation. That scenario in which secured creditors are paid the full debt on their collateral and unsecured creditors are paid nothing is commonly played out in Chapter 7s. The imposition of an artificially high retail value would bring this preferred treatment into the Chapter 13 confirmation process. Instead, the actual unsecured portion of that debt should be treated equally with the other unsecured debts.

The Court, then, considering the objectives of Chapter 13s, the purpose of the valuation in light of § 1325, the use of the collateral, now makes the following findings: this is a Chapter 13 consumer case; the collateral being retained is not income-producing; the consumer debtor will not reap a windfall by valuing the collateral midway between wholesale and retail; and a retail valuation of this collateral would unfairly or artificially elevate the creditor's claim to the detriment of unsecured creditors.

These findings lead the Court to conclude that the proposed valuation is a fair treatment of the creditor's claim under these specific facts and that the valuation proposed by the plan conforms with the requirements of section 1325 and 506(a) of the Bankruptcy Code.

**IT IS SO ORDERED.**

---

1. The disposable income requirement refutes creditor's argument that any valuation below retail constitutes a windfall to the debtor. Unless the debtor proposes a 100 percent plan, the benefit of a lower valuation would accrue to the unsecured creditors in the form of a higher dividend paid to that class.

2. Chapter 13 filings in the Southern District of Indiana have increased approximately 29 percent from December, 1991, to May, 1995.

3. The Bankruptcy Reform Act of 1994 increased the debt limits in a Chapter 13 filing from a maximum of $100,000 of unsecured debt and $350,000 of secured debt to $250,000 of unsecured debt and $750,000 of secured debt. 11 U.S.C. § 109(e).